**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| CHRISTINE J. GILLAM, RONNIE GILLAM, and ELWOOD RODNEY BUMBRAY *on behalf of themselves and all individuals similarly situated*, | |
| Plaintiffs, | |
| v. | Civil Action No. __3:17cv722__ |
| BRANCH BANKING AND TRUST COMPANY OF VIRGINIA d/b/a BB&T, | |
| Defendant. | |

## COMPLAINT

COME NOW Plaintiffs, Christine J. Gillam, Ronnie Gillam, and Elwood Rodney Bumbray, ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and file this Complaint against Defendant, Branch Banking and Trust Company of Virginia d/b/a BB&T ("BB&T"). Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      Payday loans and high-cost installment loans trap consumers in debt they cannot afford. Typically, the lenders of these "payday debt traps" require consumers to provide their bank account information and a pre-authorization to electronically debit future payments from the consumer's bank account.[1]

---

[1] *See generally* Press Release, CFPB, Consumer Financial Protection Bureau Proposes Rule to End Payday Debt Traps (June 2, 2016), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-proposes-rule-end-payday-debt-traps/; *What is a payday loan?*, CFPB, (June 2, 2017), https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567/.

2.     These payday debt traps are illegal in many states, including in Virginia, which prohibits high interest loans with annual interest rates in excess of 12% by unlicensed lenders. Va. Code §§ 6.2-1501(A), 6.2-303(A). The 12% interest cap set forth in the Virginia Code is a codification of Virginia's long standing intolerance for usurious lending. *See Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601, 312 S.E.2d 282, 285 (1984).[2] Despite the illegality of these payday debt traps in many states, predatory lenders are able to evade state licensing and usury laws through internet lending and the use of electronic funds transfers withdrawn directly from consumers' bank accounts.

3.     Banks profit from illegal predatory lending through the assessment of fees, often for overdrafts caused by unauthorized transfers initiated by the lenders.[3] Thus, "[c]onsumers who use online payday lenders may be taken advantage of twice: first, by the lenders' triple-digit interest rates that flout state caps, then with fees tacked on by the borrowers' own banks." Martha C. White, "*Payday Loans Are Bad Enough Without Banks Getting Into the Act*," TIME (March 4, 2013). "The fees can add up especially quickly and snowball when banks refuse to block payday lenders from accessing borrowers' accounts—which can then trigger overdraft fees from the bank." *Id.* "The payday lenders make out, the banks make out—and the losers are their customers." *Id.*

4.     This lawsuit challenges BB&T's practice of refusing to acknowledge its customers' revocation of authorization for pre-authorized electronic funds transfers and misrepresenting its'

---

[2] *See generally* John W. Edmonds III, *Virginia Law of Interest and Usury*, 10 U. Rich. L. Rev. 77 (1975), http://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

[3] Nearly half of consumers with internet payday loans are assessed overdraft fees, while one in three report an unauthorized withdrawal from a checking account. Pew Charitable Trusts, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* 14 (Oct. 2014).

customers' liability for the subsequent unauthorized transfers. Plaintiffs are Virginia consumers who were the victims of illegal predatory lending schemes. After learning of the illegality of their loans, Plaintiffs revoked their authorization for electronic funds transfers from their BB&T bank accounts and notified BB&T that the lenders were no longer authorized to make withdrawals from their accounts. BB&T refused to acknowledge Plaintiffs' notifications that the transfers were no longer authorized and attempted to pass off liability for any subsequent unauthorized transfers onto Plaintiffs. Even worse, with respect to Plaintiffs Christine and Ronnie Gillam, BB&T assessed unnecessary "stop-payment" fees to stop the unauthorized transfers and then also assessed overdraft fees after it failed to stop the unauthorized electronic funds transfers. Further, BB&T assessed an unnecessary $35 stop-payment fee on Plaintiff Bumbray's existing account while simultaneously convincing him to open a new account.

5.      BB&T's practices are in direct contravention to the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693-1693r, which Congress enacted in 1978 to address the precise circumstances presented by this case. Pursuant to the EFTA, a consumer generally has no liability for any unauthorized transfers made on his or her account after the consumer notifies the bank of the impending unauthorized transfer. 15 U.S.C. § 1693g. Further, because banks work for the consumer, banks are required to follow the consumer's instructions regarding electronic funds transfers from his or her account. *See* 15 U.S.C. § 1693e. Accordingly, BB&T's practices violate the EFTA, and BB&T is liable to Plaintiffs and the prospective class members for their actual and proximate damages, statutory damages, costs, and attorney's fees. 15 U.S.C. §§ 1693m, 1693h.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 1693m and 1693h.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BB&T resides in this District, Plaintiffs Christine and Ronnie Gillam reside in this District, and a substantial part of the events giving rise to their claims occurred in this District.

## PARTIES

8.    Plaintiff Christine Gillam is a natural person residing in this District and Division. She is also a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6).

9.    Plaintiff Ronnie Gillam is a natural person residing in this District and Division. He is also a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6).

10.    Plaintiff Bumbray is a natural person residing in Catlett, Virginia. He is also a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6).

11.    BB&T is a "financial institution" as defined and governed by the EFTA, 15 U.S.C. § 1693a(9), with its principal office in this District and Division.

## BACKGROUND

### Legal Background: The EFTA

12.    Congress enacted the EFTA in 1978 with the "primary objective" to provide for individual consumer rights with respect to electronic fund and remittance transfers. 15 U.S.C. § 1693. Congress recognized that although electronic banking provides conveniences for consumers, it also "to a large extent does away with human contact and authorization by a consumer's signature." H.R. Rep. No. 95-1315, at 2 (1978). Consequently, electronic transactions are "much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods." *Id.*

13.    The most important section of the EFTA is § 1693g, defining consumer liability for unauthorized transfers. *See* H.R. Rep. No. 95-1315 *supra*, at 9 ("Section 303 (liability for unauthorized transfers) is the most important section of the legislation."); *accord* S. Rep. No. 95-

1273, at 12 (1978). Section 1693g imposes limited liability on consumers for unauthorized transfers where the consumer is responsible for providing the transferee access to the account, such as through a debit card or written pre-authorization.

14.    However, a consumer has no liability if he or she notifies the financial institution of the unauthorized charge prior to its occurrence.[4] Thus, the financial institution—not the consumer—is liable for all unauthorized transfers that occur after it receives notice about the impending unauthorized charge. 15 U.S.C. § 1693g; *see also id.* § 1693a(12) (defining the term "unauthorized electronic fund transfer").

15.    When the EFTA was enacted, the issue of liability for unauthorized transfers was one of the "most crucial problems presented by electronic banking." H.R. Rep. No. 95-1315 *supra*, at 2. Section 1693g's allocation of liability was intended to create the necessary incentives for both consumers and financial institutions. The limited liability for consumers provides a financial incentive to protect their information and report losses "promptly." S. Rep. No. 95-1273 *supra*, at 32. "By requiring the financial institution to absorb any further loss, it has an incentive to minimize the risk of unauthorized uses by tightening an EFTA system's security." *Id.*

16.    The EFTA also "sets minimum safeguards for consumers who arrange for regular payments (such as insurance premiums or utility bills) to be deducted automatically from their bank accounts." S. Rep. No. 95-1273 *supra*, at 31. These safeguards protect the consumer's control over his or her own account, *see* 15 U.S.C. § 1693e, in addition to allowing the consumer to avoid

---

[4] Section 1693 expressly provides that "in no event" shall a consumer's liability exceed **the lesser of** $50 or "the amount of money or value of property or services obtained in such unauthorized electronic fund transfer prior to the time the financial institution is notified of, or otherwise becomes aware of, circumstances which lead to the reasonable belief that an unauthorized electronic fund transfer involving the consumer's account has been or may be effected."

the assessment of overdraft fees, *cf.* S. Rep. No. 95-1273 *supra*, at 31 (noting that advance notifications with respect to the amount and date of scheduled transfers "will enable the consumer to arrange to have adequate funds in his account to cover the payment or to stop payment if he chooses").

17.     Under the EFTA, stopping preauthorized withdrawals is meant to be as easy as initiating them. Accordingly, "[a] consumer is given the right to stop payment on a preauthorized transfer by notifying his financial institution orally or in writing up to 3 business days before the scheduled date of transfer. In the case of an oral notice, the financial institution may require written confirmation within fourteen days." S. Rep. No. 95-1273 *supra*, at 31; *see also* 15 U.S.C. § 1693e. By extension, financial institutions are required to make electronic funds transfers as instructed by consumers in accordance with their account's terms and conditions. 15 U.S.C. §§ 1693e, 1693h. In 1978, these safeguards were viewed as consistent with "general automated clearing house practices." S. Rep. No. 95-1273 *supra*, at 31.

18.     Section 1693m "is the backbone of enforcement" of the EFTA. H.R. Rep. No. 95-1315 *supra*, at 14. Pursuant to § 1693m, financial institutions that violate the provisions of the EFTA are liable to consumers for actual damages, additional statutory damages, and attorney's fees and costs. Section 1693m permits consumers to bring both individual and class claims.

19.     During the 1978 Congressional session, opponents of the legislation leading to the EFTA sought to "strike out this section's provision for class-action suits." H.R. Rep. No. 95-1315 *supra*, at 14. The House Committee on Banking, Finance and Urban Affairs noted in its committee report that it "most strongly support[ed]" the EFTA's "provision for class-action suits." *Id.* at 15. The threat of class actions for EFTA violations was and remains necessary to "persuade financial institutions and others subject to [the EFTA] to comply with the spirit and letter of the law." *Id.*

20.    Thus, enforcement of the EFTA through class action suits is essential to achieving EFTA's consumer protection purposes. *See* 15 U.S.C. § 1693m; *see also id.* § 1693. Indeed, in supporting the EFTA's provision for class-action suits, the House Committee on Banking, Finance and Urban Affairs further noted,

> The potential of class actions is symbolically as well as practically important to consumers and to industry. Both groups will assess the seriousness of Congressional purpose on whether or not class-action suits are provided for in this EFT legislation. Included, no one can doubt congressional intent that institutions provide EFT services only in a beneficial, responsible manner. Excluded, the opposite may be assumed.

*Id.* at 15.

21.    Further, the mandatory assessment of statutory damages in addition to actual damages is also essential to achieving the EFTA's consumer protection purposes. *See* 15 U.S.C. § 1693m; *see also id.* § 1693. With regard to the mandatory penalty, the Senate Committee on Banking, Housing, and Urban Affairs noted "that a minimum $100 penalty for noncompliance is important principally as a deterrent to noncompliance but also to assure adequate compensation in those cases where the consumer has suffered little or no actual damages but has nonetheless been inconvenienced by his financial institution's violation of the act." S. Rep. No. 95-1273 *supra*, at 36; *accord* H.R. Rep. No. 95-1315 *supra*, at 15 ("Class-action suits for damages are an essential part of enforcement of the bill because, all too often, although many consumers have been harmed, the actual damages in contrast to the legal costs to individuals are not enough to encourage a consumer to sue.").

22.    Congress was so concerned with potential EFTA violations by financial institutions that it included heightened liability for certain violations by financial institutions. *See* 15 U.S.C. § 1693h (providing for proximate damages in place of actual damages for failing to follow consumer's instructions with respect to pre-authorized electronic funds transfers and indicating

that it viewed proximate damages as including more than actual damages in part (c)); 15 U.S.C. § 1693f (providing for treble damages in place of actual damages for certain violations of § 1693f).

### The EFTA in Practice: Administrative Guidance and Interpretations

23.     As a part of its response to the 2007-2008 financial crisis, Congress established the Bureau of Consumer Financial Protection (the "Bureau" or "CFPB") and granted it with broad rulemaking, enforcement, and supervisory powers related to Federal consumer financial law, including the EFTA. 12 U.S.C. §§ 5481-5603. The Bureau's purpose is "to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C § 5511(a).

24.     Consistent with the provisions discussed above, the Bureau interprets the EFTA and its associated regulations as providing two methods for consumers to stop preauthorized electronic funds transfers from their bank accounts. *See* 12 C.F.R. Pt. 1005, Supp. I, cmt. 10(c); *see also id.* § 1005.10(c).

25.     First, a consumer may stop preauthorized electronic payments by revoking the payee's authorization and informing his or her financial institution that the electronic transfers are no longer authorized. *See* 12 C.F.R. Pt. 1005, Supp. I, cmt. 10(c). "Once a financial institution has been notified that the consumer's authorization is no longer valid, it must block all future payments for the particular debit transmitted by the designated payee-originator." *Id.* Because the electronic funds transfers are considered unauthorized electronic funds transfers and the consumer has provided notice to the financial institution, the financial institution is liable for any subsequent electronic funds transfers. *See* 15 U.S.C. § 1693g; *see also id.* § 1693a(12) (defining the term "unauthorized electronic fund transfer).

8

26.     Accordingly, an article on the Bureau's website instructs a consumer to first revoke his or her preauthorization with the lender and then send a letter to his or her financial institution providing notice that the transfers are no longer authorized. The Bureau's website provides form letters for consumers to use to revoke an authorization and notify the bank of the revocation. *See* Davida Farrar & Gail Hillebrand, *You Have Protections When It Comes to Automatic Debit Payments from Your Account*, CFPB (Nov. 23, 2015), https://www.consumerfinance.gov/about-us/blog/you-have-protections-when-it-comes-to-automatic-debit-payments-from-your-account/.

27.     Second, a consumer may stop payment of a pre-authorized electronic funds transfer pursuant to § 1693e by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. *See* 12 C.F.R. Pt. 1005, Supp. I, cmt. 10(c). "The financial institution must honor an oral stop-payment order made at least three business days before a scheduled debit. If the debit item is resubmitted, the institution must continue to honor the stop-payment order (for example, by suspending all subsequent payments to the payee-originator until the consumer notifies the institution that payments should resume)." *Id.*

28.     Accordingly, the article on the Bureau's website informs consumers of their right to stop payment on preauthorized electronic funds transfers "[e]ven if you have not revoked your authorization with the company." Farrar & Hillebrand, *supra*. A sample stop payment order letter is included on the website for consumers to use in exercising their right to stop payment under § 1693e.

29.     At the same time that the Bureau released the sample form letters to assist consumers in revoking a company's authorization to auto debit their account, the Bureau also issued a bulletin "alerting companies that they must obtain authorization before automatically debiting a consumer's account." Press Release, CFPB, CFPB Alerts Companies About Obtaining

Consumer Authorization For Recurring Auto Debits, https://www.consumerfinance.gov/about-us/newsroom/cfpb-alerts-companies-about-obtaining-consumer-authorization-for-recurring-auto-debits/.

### *Plaintiffs Christine and Ronnie Gillam's Attempt to Stop Automatic Withdrawals on their BB&T Account*

30.    Plaintiffs Christine and Ronnie Gillam took out loans with predatory lenders that charged annual interest rates as high as 750% and extremely high finance charges.

31.    As a part of their loan agreements with the predatory lenders, the Gillams provided a preauthorization for the predatory lenders to electronically withdraw payments from their BB&T checking account.

32.    After learning that the loans were usurious and thus invalid, the Gillams revoked their authorizations allowing the lenders to initiate electronic funds transfers on their account.

33.    One of the predatory lenders indicated that it was not too late for them to stop the payment but refused to honor Mrs. Gillam's revocation unless she simultaneously provided the lender with a credit card number for her payment.

34.    On July 31, 2017, Plaintiff Christine Gillam sent BB&T an email informing BB&T that the predatory lenders no longer had their permission to auto-debit their account.

35.    Attached to the email were letters from the Gillams stating that they had revoked the predatory lenders' authorizations.

36.    The Gillams' letters followed the CFPB form letter and provided all the information recommended by the CFPB, including their names, checking account number, payee company name, account number with the payee company, payment amount or range of amounts, and dates the scheduled amounts appeared on their previous statements.

37.     BB&T received the email and the attached letters and responded via email on August 10, 2017.

38.     BB&T's response ignored the Gillams' notification that the predatory lenders were no longer authorized to initiate electronic withdrawals from their account and advised them that to stop the unauthorized charges "a BB&T Stop Payment Request should be completed by a BB&T associate" "at least three (3) business days prior to the debit entry."

39.     BB&T's response further stated, "There is no guarantee a ACH Stop Payment will stop the payment from posting to your account as the transaction is electronic."

40.     Mrs. Gillam called BB&T, informing BB&T that Ronnie Gillam and she had revoked the authorizations to auto-debit their account.

41.     In the July 31st phone call, the BB&T representative told Mrs. Gillam that her revocation notification to BB&T would be ineffective in protecting her and that her only two options were to either close her account or provide BB&T with a stop payment order.

42.     Accordingly, the Gillams instructed BB&T to stop the payment through a stop payment order.

43.     BB&T assessed stop-payment fees of $70 on the Gillams account.

44.     BB&T also assessed a $2.00 "PHONE24 Charge" on the Gillams' account twice (totaling $4.00) on August 4, 2017.

45.      Upon information and belief, the "PHONE24 Charge" fee is assessed for customers who call BB&T's twenty-four-hour customer service line.[5]

---

[5] BB&T charges their customers $2 to call their customer service line, even if BB&T is unable to resolve an issue over email or other means. The $2 fee is not disclosed in BB&T's "in-depth look at the features and fees" of the BB&T Fundamentals Checking account. *See Details of Our Fees and Policies*, BB&T, https://www.bbt.com/banking/at-a-glance.page (last visited Oct. 25, 2017); *At a Glance: BB&T Fundamentals Checking*, BB&T (April 2017),

46.     In spite of the Gillams' notification that the transfers were unauthorized and their executing of the stop-payment orders as BB&T instructed, BB&T failed to stop the unauthorized electronic funds transfers initiated by the predatory lenders.

47.     As a result of the unauthorized transfers on the Gillams' account, BB&T assessed no less than eleven overdraft fees—each for $36.00.

48.     BB&T also assessed a $36.00 returned item fee to the Gillams' account as a result of the unauthorized charges.

49.     Upon information and belief, BB&T could have blocked the unauthorized transfers based on the information provided by the Gillams and in BB&T's records.

### Plaintiff Bumbray's Attempt to Stop Automatic Withdrawals on his BB&T Account

50.     Plaintiff Bumbray had two loans with predatory lenders that required him to authorize automatic withdrawals from his BB&T account as a condition to receiving the loans.

51.     On or around September 1, 2017, Mr. Bumbray revoked the authorizations with both predatory lenders.

52.     On or around September 1, 2017, Mr. Bumbray informed BB&T that the predatory lenders no longer had his permission to automatically withdraw money from his account.

53.     Mr. Bumbray went to a BB&T location and told a BB&T representative the predatory lenders were no longer authorized to initiate electronic funds transfers from his account, and he also gave the BB&T representative a notification letter.

54.     Mr. Bumbray's letter followed the CFPB form letter and provided all the information recommended by the CFPB, including his name, checking account number, payee

---

https://www.bbt.com/assets/bbtcom/content/pdf/personal/banking/at-a-glance/personal/fundamentals-al-dc-fl-ga-md-sc-tn-va-wv.pdf.

company names, account numbers with the payee company, payment amounts or range of amounts, and dates the scheduled amounts appeared on their previous statements.

55.     The BB&T representative informed Mr. Bumbray that they were unable to stop the payment without his issuing a stop payment order, and the only way to protect himself from liability for the unauthorized transfers was to open a new account.

56.     BB&T assessed a $35 stop payment fee on his old account, opened a new account for Mr. Bumbray, and transferred the balance from his original account into the new account.

**COUNT ONE:**
**VIOLATIONS OF 15 U.S.C. § 1693g**
**(CLASS CLAIM)**

57.     Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

58.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as

> All persons who (i) have bank accounts with BB&T and (ii) notified BB&T that a preauthorization on his or her account had been revoked within one year prior to the filing of this Complaint.

Plaintiffs are members of the class.

59.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members' names and addresses are identifiable through BB&T's internal business records, and the class members may be notified of the pendency of this action by published and/or mailed notice.

60.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions

include: (1) whether an electronic funds transfer that was previously authorized and then revoked is an unauthorized electronic funds transfer under the EFTA; (2) the frequency and persistence of BB&T's noncompliance with § 1693g; (3) the extent BB&T's noncompliance was intentional; and (4) whether BB&T may avoid liability through a "good faith compliance" defense.

61.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

62.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

63.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and

to the court system presented by the legal and factual issues raised by BB&T's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

64.     As alleged above, Plaintiffs and the putative class members notified BB&T that they had revoked a formerly executed preauthorization.

65.     BB&T refused to acknowledge Plaintiffs' and the putative class members' notifications, representing that Plaintiffs and not BB&T, would be liable for subsequent unauthorized electronic funds transfers.

66.     BB&T also instructed Plaintiffs and the putative class members to execute a stop payment order and assessed an unnecessary $35 fee for each "stop payment."

67.     BB&T's practices violate 15 U.S.C. § 1693g. As a result of these violations, Plaintiffs suffered concrete and particularized harms, including imposition of unnecessary fees, anxiety, emotional distress, and frustration as a result of BB&T's violations.

68.     Given BB&T's refusal to acknowledge Plaintiffs' notifications and its treatment of Plaintiffs' notices as ineffectual in conversations between Plaintiffs and BB&T employees, BB&T's violations of 15 U.S.C. § 1693g were intentional.

69.     Given BB&T's uniform response to Mr. and Mrs. Gillam and Mr. Bumbray, Plaintiffs believe they will uncover additional information in discovery showing that BB&T's noncompliance with 15 U.S.C. § 1693g is a part of a frequent and persistent pattern.

70.     Accordingly, BB&T is liable to Plaintiffs and the class members for any actual damages, statutory damages, attorney's fees, and costs. 15 U.S.C. § 1693m.

**COUNT TWO:**
**VIOLATIONS OF 15 U.S.C. § 1693e**
**(Class Claim)**

71.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

72.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as

> All persons (i) who have bank accounts with BB&T and (ii) who, within one year prior to the filing of this Complaint, notified BB&T to stop payment on a preauthorized electronic funds transfer orally or in writing at least three business days before the scheduled date of the transfer.

Plaintiffs are members of the class.

73.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members' names and addresses are identifiable through BB&T's internal business records, and the class members may be notified of the pendency of this action by published and/or mailed notice.

74.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether BB&T's practice of requiring the consumer to ensure that a BB&T employee places the stop request payment three business days prior to the withdrawal violates a consumer's right to stop payment under § 1693e; (2) whether BB&T's practice of assessing a $35 fee violates a consumer's right to stop payment under § 1693e; (3) whether BB&T's practice of insisting that opening a new account is the only way to stop a payment violates § 1693e; (4) the frequency and

persistence of BB&T's noncompliance with § 1693e; (5) the extent BB&T's noncompliance was intentional; and (6) whether BB&T may avoid liability through a "good faith compliance" defense.

75. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as the class members' claims.

76. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

77. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by BB&T's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by

allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

78.     As alleged above, Plaintiffs and the putative class members attempted to stop a withdrawal on their BB&T account by instructing BB&T that they did not want a particular lender to automatically withdraw funds from their account any longer.

79.     In violation of 15 U.S.C. § 1693e and as a common practice, BB&T requires that a consumer ensure a BB&T employee places the request for the stop payment at least three business days prior to the debit entry instead of recognizing the statutory time-period that a consumer only needs to notify BB&T three days prior to the scheduled transfer.

80.     In violation of 15 U.S.C. § 1693e, and as a common practice, BB&T assesses a $35 "stop-payment fee" when a consumer instructs BB&T to stop an automatic payment.

81.     In violation of 15 U.S.C. § 1693e, and as a common practice, BB&T insists that a consumer's instruction to stop payment may or may not be followed by the bank and the only way for a consumer to guarantee the stopping of the automatic debit is to open a new account.

82.     As a result of these violations, Plaintiffs and the putative class members suffered concrete and particularized harms. In particular, they suffered the imposition of unnecessary fees, anxiety, emotional distress, and frustration as a result of BB&T's violations.

83.     BB&T's noncompliance with 15 U.S.C. § 1693e is intentional in part because these practices are in direct contravention to a consumer's right to stop payment and based on the communications made to Plaintiffs by BB&T employees.

84.     Given BB&T's uniform response to both the Gillams and Mr. Bumbray, Plaintiffs believe that they will uncover additional information in discovery showing that BB&T's noncompliance with 15 U.S.C. § 1693e is a part of a frequent and persistent pattern.

85.    Accordingly, BB&T is liable to Plaintiffs and the class members for any actual damages, statutory damages, attorney's fees, and costs. 15 U.S.C. § 1693m.

**<u>COUNT THREE</u>:**
**VIOLATIONS OF 15 U.S.C. § 1693h**
**(Class Claim)**

86.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

87.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Christine and Ronnie Gillam bring this action for themselves and on behalf of a class initially defined as

> All persons (i) who have a bank account with BB&T and (ii) who, within one year prior to the filing of this Complaint, notified BB&T to stop payment on a preauthorized electronic funds transfer orally or in writing at least three business days before the scheduled date of the transfer, and (iii) BB&T failed to stop the payment on the account as instructed.

> Plaintiffs Christine and Ronnie Gillam are members of the class.

88.    **<u>Numerosity</u>. <u>Fed. R. Civ P 23(a)(1).</u>** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members' names and addresses are identifiable through BB&T's internal business records, and the class members may be notified of the pendency of this action by published and/or mailed notice.

89.    **<u>Predominance of Common Questions of Law and Fact</u>. <u>Fed. R. Civ. P. 23(a)(2).</u>** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether BB&T maintains procedures reasonably adapted to avoid failures to stop payments; (2) the frequency and persistence of BB&T's noncompliance with § 1693h; (3) the extent BB&T's noncompliance was intentional; and (4) whether BB&T may avoid liability through a "good faith compliance" defense.

90. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as the class members' claims.

91. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

92. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by BB&T's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

93.    As alleged above, Plaintiffs Ronnie and Christine Gillam and the other putative class members attempted to stop a withdrawal on their BB&T account by instructing BB&T that they did not want a particular lender to automatically withdraw funds from their account any longer.

94.    BB&T subsequently failed to stop the payment as instructed by the Gillams and the putative class members.

95.    Upon information and belief, BB&T made no attempt to stop the payment as instructed by the Gillams and the putative class members.

96.    Upon information and belief, BB&T does not maintain procedures reasonably adapted to avoid failures to stop automatic payments when instructed to do so by its customers.

97.    As a result of these violations, the Gillams and the putative class members suffered concrete and particularized harms, including payment of unauthorized amounts.

98.    Upon information and belief and based in part on BB&T's response to the Gillam's after the failure occurred, Plaintiffs believe that they will uncover additional information in discovery showing that BB&T's noncompliance with § 1693h is a part of a frequent and persistent pattern.

99.    Accordingly, BB&T is liable to Plaintiffs and the class members for any proximate damages, statutory damages, attorney's fees, and costs. 15 U.S.C. §§ 1693h, 1693m. Alternatively, to the extent BB&T's nonconformance was unintentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error, BB&T is liable for any actual damages. *See* 15 U.S.C. §§ 1693h, 1693m.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against BB&T on behalf of themselves and the classes they seek to represent for: (1) certification of this matter to proceed

as a class action; (2) actual, proximate, treble, and additional statutory damages as pled herein; (3) attorney's fees, litigation expenses, and costs of suit; and (4) such other relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**CHRISTINE J. GILLAM, RONNIE GILLAM, and ELWOOD RODNEY BUMBRAY**

By:_____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com


James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*