IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHRISTINE J. GILLAM, et al, on behalf of
themselves and all individuals similarly situated,
Plaintiffs,

v.                                                          Civil Action No. 3:17-cv-722

BRANCH BANKING AND TRUST COMPANY
OF VIRGINIA D/B/A/ BB&T,
Defendant.

## OPINION

The plaintiffs in this case claim that the defendant, BB&T, failed to honor stop-payment requests out of their bank accounts. BB&T moved to compel arbitration based upon the terms of the plaintiffs' bank services agreements. Under the agreements, the parties contracted to arbitrate disputes arising from their banking relationship. They also agreed to arbitrate threshold issues of arbitrability, including the scope and validity of their agreement. The Court therefore grants the motion and dismisses the case without prejudice.

## I. FACTS

Christine and Ronnie Gillam and Elwood Bumbray brought this class action suit against Branch Banking and Trust Company ("BB&T") under the Electronic Fund Transfer Act for failing to comply with their customers' requests to stop payment on preauthorized transactions. The defendant moved to compel arbitration under the terms of the Bank Services Agreement ("BSA").

The Gillams initially opened a bank account with F&M Bank. In 2002, F&M merged with BB&T, automatically transferring the Gillams' account to BB&T. Before the merger, by

protocol, BB&T sent the Gillams a "Welcome Letter" with a copy of the 2002 BSA. The 2002 BSA provided that:

> When you open or maintain a deposit account with the Bank, you are agreeing to the terms of this Bank Services Agreement ("Agreement"). The terms of this Agreement may be amended from time to time by the Bank. Amendments to this agreement will be accomplished by written notice to you. The notice may be included in your account statement. The notice may state that there has been a change in this Agreement and instruct you to pick up a revised Agreement at your local branch. Continued use of the account following notice of amendment constitutes acceptance of any amendment to this Agreement.

(Dk. No. 8-3, Ex. C).

Bumbray opened a BB&T account in 2017 and received the then-current 2016 BSA. He signed a BB&T signature card agreement, which stated in part: "By my signature, I hereby certify that . . . I have received the 'Bank Services Agreement' . . . and agree to accept the terms . . . ." (Dk. No. 8-1, Ex. A). The 2016 BSA provided that:

> The terms of this Agreement . . . may be changed from time to time by the Bank. Changes will be accomplished by written or electronic notice to you. The notice may be included on your account statement. It will explain what change has occurred and instruct you to obtain a current version of the agreement at your local branch or online at our website, www.BBT.com. Continued use of your account following a notice constitutes your acceptance of our changes. Upon the effective date of change, the current revised version of the Agreement will govern your account, regardless of whether you obtained a copy from your branch or online.

(Dk. No. 8-2, Ex. B).

In April 2017, BB&T updated the BSA and provided written notice to Bumbray and the Gillams through their bank statements, stating: (1) the arbitration clause of the BSA had been changed to the provided new language, (2) continued use of the account constituted acceptance of the changes, and (3) to find the amended 2017 Bank Services Agreement online. Specifically, the April 2017 amendment notice provided:

> The following change has been made to the Bank Services Agreement ("BSA") that you were provided when you opened your account at BB&T. Continued use of your account after the effective date of this Amendment constitutes your

2

acceptance of the change. You are directed to obtain the most current version of the BSA from any branch or online at www.bbt.com . . . .

Any dispute, claim, controversy or cause of action, that is filed in any court and arises out of or relates to this Agreement or breach, termination, **enforcement, interpretation of validity thereof, including the determination of the scope or applicability of this agreement, shall be determined by arbitration** before one arbitrator at a location mutually agreed upon in the state where your account is maintained, or as may be otherwise required under the JAMS Minimum Consumer Standards, which is incorporated by reference herein. The arbitration shall be administered by JAMS pursuant to its streamlined Arbitration Rules and Procedures.

(Dk. No. 8-10, Ex. J) (emphasis added).

## II. ANALYSIS

"In the Fourth Circuit, a litigant can compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, 'if he can demonstrate (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002). The plaintiffs say that they need not arbitrate because BB&T cannot prove the second element, a valid written agreement to arbitrate. They claim that the BSA fails for two reasons: First, they say they never entered the agreement. Second, they say the BSA is illusory and unconscionable.

### i. Formation

The plaintiffs contest contract formation at two stages. First, they claim that they never entered into any binding agreement with BB&T. Second, they claim that they did not agree to the modified contract terms in the most recent 2017 BSA that contains the contested arbitration clause. Both arguments fail.

To determine whether the parties agreed to arbitrate, courts apply state law principles governing contract formation. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "Virginia contract

3

law requires the standard elements of offer, acceptance, and consideration for the formation of a valid contract." *Hill v. Alstom Power, Inc.*, No. 3:13-CV-00496-JAG, 2013 WL 6408416, at *2 (E.D. Va. Dec. 6, 2013). Contract formation requires mutual assent of the parties, which "may be inferred from the acts and conduct of the parties." *Durham v. Nat'l Pool Equip. Co. of Va.*, 205 Va. 441, 445, 138 S.E.2d 55, 58 (1964). "[M]anifesting acceptance by engaging in activity explicitly recognized as such in the governing contract provisions is sufficient to demonstrate assent under Virginia law." *Klein v. Verizon Commc'ns, Inc.*, No. 112CV00757GBLIDD, 2017 WL 5071306, at *4 (E.D. Va. Aug. 9, 2017) (citing *In re Frye*, 216 B.R. 166, 171 (E.D. Va. 1997) (holding that a party may convey his acceptance of a contract to another party "in a variety of ways so long as the actions or conduct can be interpreted objectively as constituting an acceptance")).

Virginia recognizes the use of signature cards as a valid means of agreeing to a contract. *Fleming v. Bank of Virginia*, 231 Va. 299, 305, 343 S.E.2d 341, 344 (1986) (citing *Colley v. Cox*, 209 Va. 811, 814, 167 S.E.2d 317, 319 (1969)) ("The signature card constitute[s a] contract between the parties and, subject to the statutory scheme, regulates their rights and duties.") Finally, "a mutual promise to arbitrate itself constitutes sufficient consideration for an arbitration agreement." *Tarpley v. Livings*, No. 4:16-CV-00021, 2016 WL 4537751, at *4 (W.D. Va. Aug. 30, 2016).

Applying these principles here, the Court finds that the parties entered into the BSA contracts. Bumbray signed the signature card, agreeing to be bound by the contract. Whether he read the terms of the contract or not, he agreed to be bound by its terms. Similarly, the Gillams received the welcome letter from BB&T after BB&T took over their F&M bank accounts.[1] The letter referred to the BSA, which said that by maintaining a bank account with BB&T, they agreed to the terms of the agreement. They did not need to sign anything where the express

---

[1] BB&T says that it would have sent the welcome letter as a matter of course. In opposition to the present motion, the Gillams say that BB&T does not have the copy actually sent to them, but they never argue that they did not receive the letter.

4

terms of the offer indicated that continued use of the account would constitute acceptance of the terms of the agreement. By receiving the BSA and continuing to use the bank, the Gillams engaged in activity explicitly recognized in the contract and therefore agreed to be bound by the terms of the BSA.

Next, the plaintiffs agreed to the modifications to the initial agreement, including the 2017 BSA that contains the arbitration provision at issue. Contracts can contain provisions saying that continued use will bind parties to modified contract terms. *Klein*, 2017 WL 5071306, at *4 ("By continuing to use the internet services provided by Verizon, Klein manifested his assent to the 2012 modification under the parameters specifically recognized as reflecting acceptance under the terms of his contract.") Here, the plaintiffs' initial BSAs contained provisions that allowed BB&T to modify the terms of the BSA by providing notice of the change. The plaintiffs could close their accounts should they wish not to accept. When BB&T updated the BSA in 2017, it provided written notice to the plaintiffs. That notice reminded them that continued use of their bank accounts would constitute acceptance of the additional terms, and then provided the arbitration clause. When the plaintiffs continued using their accounts, they agreed to arbitrate disputes arising after that time.

*ii. Validity and Scope*

The plaintiffs next claim that the BSA is both unconscionable and illusory, and therefore unenforceable.

Through agreements referred to as "delegation provisions," "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). When faced with an arbitration agreement that seeks to turn issues of arbitrability over to an arbitrator, "courts should not assume that parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Option*

5

*of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). At least in contracts involving sophisticated parties, the inclusion of language in an arbitration agreement that refers to the rules of well-established arbitration rules indicates clear and convincing evidence that the parties intended to arbitrate issues of arbitrability. *Simply Wireless, Inc v. T-Mobile US, Inc*, 877 F.3d 522, 527–28 (4th Cir. 2017) ("In the context of a commercial contract between sophisticated parties, the explicit incorporation of JAMS Rules serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability."); *U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*, No. 1:11CV371, 2013 WL 1332028, at *6 (E.D. Va. Mar. 29, 2013) ("[T]he incorporation of the AAA Commercial Rules (Expedited) is a 'clear and unmistakable' delegation of arbitrability to the arbitrator.").

In this case, the arbitration agreement contains a clear provision that says the arbitrator, and not the Court, determines the scope and validity of the contract:

> Any dispute, claim, controversy or cause of action, that is filed in any court and arises out of or relates to this Agreement or breach, termination, enforcement, interpretation of validity thereof, including the determination of the scope or applicability of this agreement, shall be determined by arbitration . . . .

(Dk. No. 8–10). It also says that JAMS will conduct the arbitration pursuant to its Streamlined Arbitration Rules and Procedures. The clear language sending issues of validity, scope, and interpretation of the contract to an arbitrator, combined with the reference to the JAMS rules, presents clear and unmistakable evidence that the parties agreed to arbitrate threshold issues.

The plaintiffs, however, challenge the enforceability of the delegation provision by claiming that it is illusory and unconscionable. They say it is illusory because BB&T could change the terms without notice, retroactively, and at any time.[2] The plaintiffs note that, where

---

[2] In reality, the plaintiffs challenge the validity of the entire agreement, but the Court considers the arguments only as they relate to the delegation provision.

6

one party maintains unfettered discretion to modify the contract at any time, the party has not bound itself any term. *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 585 (D. Md. 2013) (invalidating an arbitration agreement where the agreement's terms only bound an employee and not an employer and where the employer could change the terms of the agreement at any time). But here, BB&T could not change the terms of the delegation provision at any time. Rather, it had to provide notice to the plaintiffs, who could either accept the terms through continued use or reject the terms by terminating their bank accounts. No language within the BSA itself[3] supports the idea that BB&T could make the changes retroactively, and the continued use provision provided a valid means for BB&T to update the BSA. Since BB&T could only amend the delegation provision on notice to the plaintiffs, and it is therefore enforceable.[4]

Next, the plaintiffs claim that the delegation provision is unconscionable and lacks mutuality. "Unconscionability has both a substantive and procedural element. The former requires a gross disparity in the value exchanged. The latter necessitates inequity and bad faith in 'the accompanying incidents . . . , such as concealments, misrepresentations, undue advantage, oppressions on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like." *Lee v. Fairfax Cty. Sch. Bd.*,

---

[3] The plaintiffs point to real-world instances where BB&T made changes to the BSA and provided notice after the fact, but the terms of the BSA would not make such modifications binding without prior notice, so those instances to not bear on the enforceability of the modifications at issue here, which the plaintiffs admit to having received.

[4] The plaintiffs also argue that the contract is an invalid contract of adhesion. Under Virginia law, a contract of adhesion is "a standard form contract, prepared by one party and presented to a weaker party, usually a consumer, who has no bargaining power and little or no choice about the terms." *Philyaw v. Platinum Enters., Inc.*, 54 Va. Cir. 364, 366 (2001). Where one party can choose from multiple competing services and walk away from the agreement at any time, however, they do not lack bargaining power. *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 846 (E.D. Va. 2014) (quotations omitted). This argument fails.

7

621 F. App'x 761, 763 (4th Cir. 2015). A contract is unconscionable when it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Chaplain v. Chaplain,* 54 Va. App. 762, 682 S.E.2d 108, 113 (2009). Additionally, "'if it appears that one party was never bound on its part to do the acts which form the consideration for the promise of the other, there is a lack of mutuality of obligation and the other party is not bound.'". *Cauvel v. Schwan's Home Serv., Inc.*, No. 6:10-CV-00012, 2011 WL 573378, at *7 (W.D. Va. Feb. 10, 2011) (quoting *Busman v. Beeren & Barry Invs., LLC*, 69 Va. Cir. 375, 378 (Va. Cir. Ct. 2005)). Here, the contract does not meet the stringent test of lack of mutuality and unconscionability.

As an initial matter, the delegation provision does not lack mutuality. BB&T had the ability to change the terms of the agreement, but it could only do so on notice to the plaintiffs. Both parties therefore promised to be bound by the terms of the delegation provision, and BB&T could amend those terms only on notice to customers. Further, the parties agreed to use well recognized arbitration organizations, and nothing in this case suggests that the arbitrator will somehow favor BB&T. Simply put, nothing about an agreement to delegate threshold issues of arbitrability to an arbitrator, even when one party can change the terms of that delegation at any time on notice, rises to the level of unconscionability.

### III. CONCLUSION

The parties in this case entered into an agreement in which they agreed to arbitrate threshold contractual issues such as the contract's scope and validity. Before this Court may hear the merits of the case, an arbitrator must therefore decide the validity of the overall agreement and whether scope of the present dispute falls within the scope of the arbitration provision. "[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are

8

arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) (emphasis added). With the issue of arbitrability referred to the arbitrator, nothing in the plaintiffs' claims remains for the Court to consider. Accordingly, the Court dismisses the case without prejudice.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: August 7, 2018
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge